***********
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and oral arguments before the Full Commission. The appealing party has not shown good ground to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award. Accordingly, the Full Commission affirms the Opinion and Award of Deputy Commissioner Ledford.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
2. An employment relationship existed between the parties at all relevant times.
3. The defendant-employer was insured for workers' compensation coverage at all relevant times.
4. Plaintiff's average weekly wage for purposes of this claim is $787.36 (which yields a compensation rate of $524.91).
5. Plaintiff alleges he suffered a heart attack arising out of his employment on September 23, 1998, which the defendants deny.
6. Plaintiff has not worked since September 23, 1998.
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 37 years old at the time of hearing before the Deputy Commissioner. He has a high school education. Zemex, the defendant-employer, is involved in mining raw feldspar ore and produces silica sand. Plaintiff began working for Zemex in January 1984 as a car loader and bagger. His heavy equipment familiarity includes front-end loaders and forklifts.
2. Plaintiff was promoted to shipping director, a position he began on January 1, 1997, and was compensated by salary from that time. Due to corporate restructuring and planning, three separate positions were consolidated into the new shipping director job, which plaintiff assumed. Prior to becoming shipping director, plaintiff had worked as a laborer with no experience in management, paperwork, or team responsibilities.
3. In the shipping director position, plaintiff was responsible for supervising approximately 9 to 10 hourly employees. He had many duties, which included the following:
 (a) Coordinating the efficient use of 1200 trucks per month used to transport mining products;
 (b) Keeping up with products in the bins and making sure the bins stayed properly filled and that bin measurements were properly recorded;
 (c) Coordinating the efficient use of 100 railcars per month, making sure they were properly loaded and assisting with loading if needed;
 (d) Documenting the monthly sale of materials amounting to approximately 20,000 tons per month. When he began in this position, the company was producing approximately 12,000 to 14,000 tons per month. While he was shipping director, the production increased to approximately 20,000 tons per month;
(e) Preparing 1400-1500 bills of lading per month;
 (f) Keeping color-coded ledgers of all products shipped and delivered;
 (g) Dealing with 3 salespeople about shipping problems and scheduling;
(h) Dealing with customers about the status of orders;
(i) Preparing 2 to 4 production reports per month; and,
(j) Being available on call 24 hours, 7 days a week.
4. Plaintiff's job as shipping director was his first employment experience in which he directly reported to several bosses. One of plaintiff's bosses was the president of Zemex, Peter Goodwin. Zemex had five presidents in the five years before Peter Goodwin assumed the position in 1995. There were also different plant managers in the years leading up to plaintiff's heart attack. Each new plant manager seemed to require new and different information from plaintiff. These frequent changes in leadership and management styles added to the pressures otherwise associated with the shipping director job.
5. Plaintiff was involved in two union elections during his supervisory tenure with Zemex. In the first proposed election in January 1997, plaintiff was used as a direct link to the workers, due to his background as a laborer prior to becoming shipping director. The management team regularly met to plot strategy and consider trends among the workers' attitudes toward the union. The management, and in particular President Goodwin, were adamantly opposed to the union and did everything they could to keep the union out. They called upon plaintiff to keep them informed of the workers' attitudes and to do his part to keep the union out. This caused additional stress for plaintiff, as he was forced to take a tougher position with the employees, many of whom he considered friends.
6. When the January 1997 union election was cancelled, a second and ultimately successful union vote was scheduled for March 1998. Prior to the election, plaintiff was again asked to lobby his former co-workers to vote against the union. After the March 1998 election, as Mr. Goodwin admitted in his testimony, management intentionally dragged out the signing of the final union contract for fourteen months. The union contract was actually signed in May 1999. Between the election and contract signing, plaintiff was instructed to stockpile mining product to counteract the impact of a possible union strike.
7. Plaintiff discussed his excessive work load with Vice President of Plant Operations Pete Lawson, Plant Manager Joe Turner, and Human Resource Director Scott George at various times during his employment as shipping director. While they sympathized with his situation, each man told him that budget constraints prevented them from providing additional help. Plaintiff did not demand help or threaten to quit. He did not believe he could find another position paying such a good salary in rural Mitchell County with only a high school education. At one time, Linda Beauvais provided plaintiff with some clerical assistance for about 10 to 15 minutes per day, entering tonnage into the computer for billing purposes. At most, Ms. Beauvais assisted plaintiff on 10 separate occasions, which did not ease the significant burden of paperwork that plaintiff was required to prepare daily.
8. James Beaver worked for Zemex as a car loader operator for sixteen years. He was under plaintiff's supervision, and last worked for Zemex in September 1998, when plaintiff left Zemex due to his heart attack. Mr. Beaver observed and testified that plaintiff's job had a huge amount of stress and pressure, noting that he would not have accepted the position. Additionally, Mr. Beaver testified that plaintiff had no help with completing paperwork and preparing the bills of lading, despite large increases in inventory production and storage during the period of time between the union election and contract ratification.
9. David Ledford worked as a mechanic for Zemex for about twenty years. When plaintiff left Zemex due to his heart attack, Mr. Ledford assumed plaintiff's position as shipping director for about fourteen months. Mr. Ledford testified that the job demands were enough for three people, with lots of demands and pressures. During his tenure, he worked long hours with no additional help. When Mr. Ledford had an opportunity to take another job as an hourly employee for more money with less responsibility, he took it.
10. Tim Grindstaff worked for Zemex for only two days in December 1999 in the shipping director job formerly held by plaintiff. He testified the amount of paperwork and pressure of the job "overwhelmed" him and that although he thought the position was a good opportunity, he "ran" back to his old job. Mr. Grindstaff testified that the position was not anything he would ever want to try again.
11. Barbara Crisp worked in accounting and finance for Zemex from July 1990 to February 1998. She worked with plaintiff and testified that he personally handled invoice problems and complaints. Ms. Crisp testified that plaintiff always did a good job and was dependable. She described plaintiff's job as very stressful and testified that she would not want the position. Ms. Crisp observed increased symptoms of stress in plaintiff toward the end of her employment with Zemex. Plaintiff became less social and friendly, and more harried and stressed with his work during the last contacts she had with him. She also noted that President Goodwin was a controlling leader, who visited the plant often and wanted things done his way.
12. Peter Goodwin, who became President of Zemex in 1995, testified that plaintiff was a "very hard worker" who did a "good job." However, Mr. Goodwin observed that plaintiff was always in real or perceived "turmoil" over working conditions and production. He admitted that three separate positions were consolidated into the shipping director job. Mr. Goodwin also testified that production increased markedly during the time plaintiff handled shipping operations, in order to minimize the impact of any union work stoppage after the union contract was ratified. Mr. Goodwin agreed that plaintiff "may have" asked for help with paperwork. He agreed that plaintiff had accurately testified about the employment responsibilities in this "busy job." He recalled three different plant managers served during his tenure as president, and that three people have held the shipping director position since plaintiff left Zemex in September 1998.
13. Plaintiff took his work very seriously. He was on call 24 hours a day 7 days a week and was often called at home. Plaintiff rarely took vacation, and when he did, he checked in with the company daily by phone. As both John David Lawson, the vice president of operations for Zemex, and Peter Goodwin, the President of Zemex, testified, plaintiff was very hard working and conscientious and did a good job for the company.
14. At the request of the employer, plaintiff attended several physical examinations with physicians they selected both prior to his employment and during his employment. These examinations were performed on January 23, 1984, May 28, 1985, and May 13, 1996. Each examination revealed no heart problems and/or coronary disease problems. On April 21, 1995, plaintiff underwent heart catheterization, performed by Dr. Kent Salisbury, which revealed "normal coronary arteries and normal ventricular function."
15. On or about September 23, 1998, plaintiff suffered a heart attack while at work. Between the March 1998 union election and the May 1999 union contract ratification, tension at the plant between workers and management was high. On this particular day, plaintiff got into an argument with interim Union President Steve Hall, when plaintiff was assisting David Ledford with loading a bag car. According to plaintiff, one of these workers commented that plaintiff, as a member of management, would not be able to physically help union members do their work once the contract was approved. Since plaintiff had always provided physical help to his former co-workers when necessary, he took offense at this suggestion that he could not help workers under him. After some heated argument between plaintiff and Steve Hall, plaintiff began to fell pain radiating down his left arm, a pain he had not experienced before.
16. Plaintiff went to Spruce Pine Community Hospital Emergency Room around 9 or 10 p.m. that night. Initially, his complaints were treated as epigastric pain, and he was given a "GI cocktail." However, he returned to the ER around 3 a.m. on September 24, with ongoing pain complaints. Plaintiff was admitted to assess for possible coronary artery disease or myocardial infarction (MI). From that hospital, plaintiff was transferred by ambulance to Memorial Mission Hospital in Asheville for cardiac catheterization, which confirmed a "two-vessel coronary artery disease with recent inferior wall myocardial infarction and associated moderate left ventricular dysfunction."
17. Plaintiff has not worked since September 23, 1998. He was told by then-Plant Manager Joe Turner that Zemex had no job that would be less stressful than plaintiff's shipping director position, and that the employer could not accommodate plaintiff's medical restrictions in any job. Plaintiff testified that he tires easily and is constantly drowsy from the heart medications he takes. He worries that the lack of concentration and sleepiness could endanger co-workers and/or himself at any potential job. Plaintiff felt he could only lift up to 10 pounds and stand no more than 15-20 minutes at a time. He does not feel he is able to work in any employment, due to his coronary condition.
18. Plaintiff received full salary as short-term disability payments (STD) for six months after being diagnosed with coronary artery disease. According to plaintiff's Exhibit No. 2, all of the STD premiums were paid by the defendant-employer. Plaintiff received $2060/month in long term disability payments (LTD) until March 2001, when he was approved for social security disability benefits (SSD), retroactive to September 1998. The LTD premium payments were funded 70% by the defendant-employer and 30% by plaintiff.
19. Dr. Kent Salisbury is a cardiologist, board-certified in internal medicine and cardiovascular disease, and supervised plaintiff's April 20, 1995, heart catheterization. He testified that the catheterization findings showed no evidence of any cardiac damage and no indication of any obvious blockages in the coronary arteries or what would be called artherosclerotic plaques. Dr. Salisbury agreed that how stress is handled is probably more important than stress itself. He could not state an opinion as to whether or not plaintiff's job pressures could have contributed to or aggravated his later coronary problems.
20. Dr. John Lawrence is a cardiologist, board-certified in internal medicine, cardiovascular diseases, and interventional cardiology. He treated plaintiff immediately following his heart attack, and currently handles plaintiff's coronary care. Dr. Lawrence has identified five strong risk factors for coronary artery disease: elevated cholesterol levels, hypertension (high blood pressure), tobacco use, a family history of coronary artery disease, and diabetes. Plaintiff had four of these risk factors, excluding only diabetes. Dr. Lawrence acknowledged that external circumstances, such as how a person handles stress, also play a role in the development of coronary artery disease.
21. Dr. Lawrence confirmed that plaintiff had coronary artery disease, which led to his heart attack. Initially, Dr. Lawrence stated an opinion that plaintiff's heart attack was "not significantly caused by or contributed to by his job at Zemex." However, in his testimony, Dr. Lawrence admitted that he did not know the degree of stress sustained by plaintiff in his work environment, but that it certainly sounded like a stressful situation. In his opinion, plaintiff's artery plaques were caused by multiple risk factors. However, Dr. Lawrence further testified that the work circumstances, and how plaintiff responded to them, could have contributed to plaintiff's coronary condition. The environmental stress could have contributed to circumstances in which plaques changed, clots formed, and vessels narrowed acutely.
22. Dr. Lincoln, now retired, was a board-certified orthopaedic surgeon for twenty-nine years. Beginning in 1991, he treated plaintiff for orthopaedic problems, including progressive conditions in both knees and a tear to his right rotator cuff. After treating these injuries, Dr. Lincoln allowed plaintiff to return to full duty work with Zemex. He prescribed a knee brace for plaintiff's use. Dr. Lincoln's last active treatment of plaintiff was in 1997. After learning of plaintiff's heart condition, Dr. Lincoln stated his opinion that plaintiff's work pressures and stress contributed to plaintiff's coronary problems, and that plaintiff was disabled from any type of gainful employment both from an orthopaedic and cardiac standpoint.
23. Dr. Alfred Earwood, plaintiff's family doctor, also testified in this case. On at least a couple of occasions, plaintiff told Dr. Earwood that he was experiencing a great deal of stress at work. Dr. Earwood stated his opinion that stress is a risk factor for coronary artery disease. Stress causes the release of epinephrine and norepinephrine, which causes damage to the heart artery. In Dr. Earwood's opinion, plaintiff's increased stress at work contributed to plaintiff's development of coronary artery disease over the years. He believes plaintiff is disabled due to his physical condition.
24. Dr. Edward Lyle St. Bernard, a specialist in internal medicine and pulmonary medicine, also testified in this matter. He was plaintiff's treating physician for a time during 1998 and 1999. When he saw plaintiff during this time, plaintiff was "clearly very stressed and very worried overall about the job." In Dr. St. Bernard's opinion, plaintiff's coronary problems were exacerbated, aggravated, or accelerated by his job at Zemex.
25. In weighing the medical opinions, greater weight has been given to those physicians who have definite opinions regarding any causal connection between plaintiff's job stress and the development of his coronary artery disease, which led to his heart attack, than to any physicians who did not hold opinions. A greater number of physicians who testified also acknowledged the relationship of stress to the development of coronary artery disease.
26. The greater weight of the evidence shows that plaintiff was employed in a very high-stress position at Zemex. There were a lot of external demands on plaintiff, including being on call 24 hours a day seven days a week. Another very stressful factor was the attempt to unionize the plant where plaintiff worked. Some of plaintiff's stress also arose because he was a very conscientious employee and always did his best for his employer.
27. Although plaintiff had other risk factors, the stress at his place of employment was a significant contributing factor in the development of his coronary artery disease. As the testimony of the physicians shows, coronary artery disease is widespread among the general public. However, the testimony of co-workers showed a particularly high stress level in plaintiff's work environment. The testimony of Drs. Earwood and Lincoln, and to some extent, Dr. Lawrence, indicates that plaintiff's work put him at a higher risk of stress than the general public.
28. At the time the evidence in this case was completed, plaintiff had not yet returned to work. The evidence of record, including the physicians' opinions, indicates plaintiff is not capable of returning to gainful employment at this time, due to his cardiac condition.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In a claim regarding an occupational disease, the claimant must establish both that his disease is due to causes and conditions that are characteristic of and peculiar to a particular trade, occupation, or employment and that it is not an ordinary disease of life to which the general public is equally exposed. Booker v. Medical Center, 297 N.C. 458,468, 256 S.E.2d 189, 196 (1979). The greater weight of the evidence establishes that plaintiff's employment caused him to experience an abnormally high degree of stress, which contributed to his development of coronary artery disease and led to a subsequent heart attack. The evidence additionally shows that the extremely stressful nature of plaintiff's job put him at a higher risk of developing coronary disease as compared to members of the general public. Moreover, on the date of his heart attack, plaintiff had a particularly stressful encounter with a co-worker that was related to the unionization of the plant.
Plaintiff's employment was a significant contributing factor to the development of his coronary artery disease, which led to his heart attack of September 23, 1998. Plaintiff has met his burden of proving that his occupational exposure to stress was such a significant factor in the development of his coronary artery disease and subsequent heart attack that without it the disease's development would not have been to such an extent that it caused the physical disability that resulted in plaintiff's incapacity for work. See Perry v. Burlington Industries,Inc., 80 N.C. App. 650, 343 S.E.2d 215 (1986) (citing Rutledge v. TultexCorp., 308 N.C. 85, 101, 301 S.E.2d 359, 369-70 (1983)).
For these reasons, plaintiff's coronary artery disease and resulting heart attack is compensable as an occupational disease. N.C. Gen. Stat. §§ 97-2(6) and 97-53.
2. N.C. Gen. Stat. § 97-53(13) does not require that the conditions of employment be the exclusive cause of an occupational disease in order to be compensable. Humphries v. Cone Mills Corporation, 52 N.C. App. 612,614, 279 S.E.2d 56, 58 (1981). Thus, just because plaintiff's coronary artery disease can be related in part to additional risk factors does not preclude compensation for plaintiff's occupational exposure to severe stress.
3. As a consequence of his heart attack, plaintiff has incurred medical expenses. Defendants are responsible for payment of all such expenses for reasonably necessary medical treatment. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
4. As a consequence of his heart attack, plaintiff has been unable to earn wages in any gainful employment and has been totally disabled since September 24, 1998. N.C. Gen. Stat. § 97-29.
5. Plaintiffs average weekly wage of $787.36 yields a compensation rate of $524.91.
6. Defendants are entitled to a credit for short-term disability benefits paid to plaintiff under the employer-funded plan. Defendants are not entitled to a credit for payments made under the long-term disability plan, as plaintiff paid for a portion of those premiums. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay all medical expenses incurred by plaintiff as a consequence of the heart attack he suffered on or about September 23, 1998. Defendants shall continue to pay all expenses for reasonably necessary medical treatment of plaintiff's heart condition.
2. Defendants shall pay plaintiff compensation at the rate of $524.91 per week beginning September 24, 1998, and continuing until further order of the Commission as total disability compensation. All benefits that have accrued shall be paid in a lump sum.
3. Defendants are allowed a credit toward accrued benefits for amounts previously paid as short-term disability benefits. The credit shall be calculated from payments made by the employer in each week during which compensation was due and payable, without any carry-forward or carry-back of credit for amounts paid in excess of the compensation rate in any given week.
4. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff is approved for his counsel. Defendants shall pay to plaintiff's counsel twenty-five percent of the accrued compensation due plaintiff. Additionally, defendants shall pay to plaintiff's counsel every fourth check due plaintiff in the future.
5. Defendants shall pay the costs.
This 19th day of February 2003.
 S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER